Froessel, J.
Defendant was convicted of (1) one count of conspiracy in violation of subdivision 1 of section 580 of the Penal Law; (2) 11 counts of aiding and employing others to wire tap unlawfully in violation of subdivision 6 of section 1423 of the Penal Law; (3) 2 counts of using rooms and apparatus for unlawful wire tapping in violation of subdivision 6 of section 1423 of the Penal Law; and (4) 2 counts of unlawfully possessing wire-tapping instruments in violation of section 552-a of the Penal Law; and sentenced to a total term of two to four years.
The evidence showed that with the aid of two telephone company employees, Buh and Asmann, and an expert on telephonic communications and recording devices named Shannon, the defendant, who was an attorney and a private investigator, established and maintained wire-tapping plants in two apartments in midtown Manhattan. Taps were placed on the telephones of business concerns such as Bristol-Meyers, E. B. Squibb, Inc., the Knoedler Art Galleries and private individuals, including the chairman of the board of Pepsi-C'ola. Numerous recordings of telephone conversations were made for the purpose of securing information of value to defendant’s clients.
All three accomplices testified against defendant. The testimony of other witnesses established, among other things, that defendant had rented one of the apartments under an assumed name and that special wiring had been installed there; that defendant employed messengers to transport packages — containing recordings of conversations, according to Shannon— from one of the apartments used as a wire-tapping headquarters to defendant’s office; and that defendant had negotiated with clients or prospective clients to supply them with information about the persons and concerns whose telephones were tapped. Defendant does not contest the legal sufficiency of the proof on this appeal, but attacks the validity of his conviction on other grounds.
*505 His first contention relates to the meaning of the word “ wilfully ” in subdivision 6 of section 1423 of the Penal Law. That subdivision, as it read when the offenses were committed, made it a felony punishable by two years’ imprisonment to ‘‘ unlawfully and willfully cut, break, tap, or make connection with any telegraph or telephone line, wire, cable or instrument, or read or copy in any unauthorized manner any message, communication or report passing over it, in this state ” (emphasis supplied). The trial court charged the jury that “‘Wilful’ does not mean that a person does an act motivated by feelings of spite, malice or hate. It merely means intentionally doing an act and knowing that the act is being done ’ ’. An exception to the above definition was taken by the defense attorney.
Defendant argues that the word “ willfully ”, as used in subdivision 6, means ‘ ‘ ‘ wantonly ’ and ‘ maliciously ’, as differentiated from merely ‘ intentionally ’ or ‘ knowingly ’ ’ ’, and that, because of the erroneous nature of its charge, the trial court ‘ ‘ failed to submit an essential element of the crime to the jury for its consideration ”. He also argues for the first time that “wilfully” must be interpreted to mean “maliciously” to save the constitutionality of said subdivision 6 of section 1423 since if the statute is construed as intended to protect the privacy of telephone conversations — as contended by respondent—rather than as a malicious mischief statute “ intended to prevent harm to local property ” — as contended by defendant — then it was pre-empted by the enactment of section 605 of the Federal Communications Act and offends the supremacy clause of the Federal Constitution (art. VI, § 2). He bases this contention on three decisions of the Supreme Court of the United States (Benanti v. United States, 355 U. S. 96 [1957]; Auto Workers v. Wisconsin Bd., 351 U. S. 266 [1956] ; Pennsylvania v. Nelson, 350 U. S. 497 [1956]) which were handed down between April 2, 1956 and December 9, 1957, before the affirmance by the Appellate Division in this case on May 13, 1958 (6 A D 2d 674).
Section 1423 is found in article 134 of the Penal Law, entitled “Malicious Mischief”. That part of the section prohibiting wire tapping was inserted in 1892, long after the property damage provisions were enacted (Report of N. Y. State Joint Legislative Committee to Study Illegal Interception of Com *506 munications, N. Y. Legis. Doc., 1956, No. 53, p. 13). The various subdivisions of section 1423 define a host of offenses involving injury or damage to highways, bridges, dams, sewers, telephone or telegraph lines and the like. All of these offenses, according to the language of the statute, must be committed “ wilfully or maliciously ” (emphasis supplied), except certain offenses like wire tapping, specified in subdivision 6, which must be committed “ unlawfully and wilfully”.
The word “wilfully”, as used in the phrase “wilfully or maliciously ” in section 1423, has been held to include the element of malice — Wass v. Stephens (128 N. Y. 125, 129). That case, however, was decided in 1891, when every act in the statute had to be committed, according to its terms, ‘ ‘ wilfully or maliciously ”. It was not until the following year (L. 1892, ch. 372) that the statute (then Penal Code, § 639, subd. 7) was amended to include the telephone, and as to the tapping of a telephone the amendment merely required that it be done ‘ ‘ unlawfully and wilfully”. And in People v. Senes (210 App. Div. 845, affd. 242 N. Y. 556), which apparently was the only conviction for wire tapping ever reported in this State prior to the instant ease (see N. Y. Legis Doc., 1956, No. 53, supra, pp. 14, 29), while the trial court instructed the jury that the word 1 ‘ wilfully ”, as used in the phrase “unlawfully and wilfully” in section 1423, included a malicious intent to injure someone, the correctness of this charge was not raised on appeal since it was most favorable to defendant. No appellate court in this State has ever imported the element of malice into the word 1‘ wilfully ” as used in the phrase “ unlawfully and wilfully” in subdivision 6 of section 1423. By specifying that the crime of wire tapping was committed when one acted “ unlawfully and wilfully ”, in contradistinction to the many crimes of property damage outlined in section 1423, which required that a person act ‘ ‘ wilfully or maliciously ’ ’, it is fair to assume that the Legislature indicated that the word “wilfully”, as used in subdivision 6, meant deliberately, as opposed to maliciously or viciously.
Moreover, in People v. Applebaum (277 App. Div. 43, affd. 301 N. Y. 738), it was recognized that subdivision 6 of section 1423 was intended to protect the privacy of telephone conversations as well as to prohibit physical damage to telephone equip *507 ment. Defendant here concedes in effect that, if the statutory provision prohibiting wire tapping was aimed at invasions of privacy, then the element of malice or spite, a natural ingredient of the many crimes of property damage listed in section 1423, would not be comprehended in the word ‘ ‘ wilfully ’ ’ as used in subdivision 6 of section 1423.
In 1957 the crime of wire tapping was taken out of subdivision 6 of section 1423 and placed in a new article and section of the Penal Law (art. 73, § 738) entitled “Eavesdropping”. The 1957 Interim Report of the Joint Legislative Committee on Illegal Interception of Communications (N. Y. Legis. Doc., 1957, No. 29, p. 13 et seq.), insofar as relevant here, emphasized that one of the purposes of the proposed legislation, subsequently enacted into law, was to ‘ ‘ Consolidate present scattered laws on interception of communications ” (p. 14), including ‘ ‘ the rephrasing of the present law against wiretapping, now inappropriately classified as malicious mischief, along with damage to sewers, water mains, and piers.” (P. 16, emphasis supplied.) One of the objectives of the consolidation was to ‘ ‘ make it clear that the evil of wiretapping is not merely in the offense against property but particularly in the violation of privacy — the eavesdropping.” (P. 14, emphasis supplied.)
We think it beyond dispute that the prohibition against wire tapping, as it existed in subdivision 6 of section 1423, was primarily designed to protect the privacy of telephone conversations. This being so, the word ‘ ‘ wilfully ’ ’, carried over from subdivision 6 of section 1423 into the new statutory section forbidding ‘‘ eavesdropping ’ ’, would logically refer to an act consciously and deliberately done and would not include the element of malice. The invasion of privacy implicit in wire tapping is the same, whatever the motives of the unauthorized tapper may be.
This brings us to the more serious question involved in this case, namely, whether the prohibition against wire tapping contained in subdivision 6 of section 1423, intended to prevent invasions of privacy, was pre-empted by section 605 of the Federal Communications Act. That Act was enacted by Congress in 1934 (48 IT. S. Stat. 1064, 1103; U. S. Code, tit. 47) and its main purpose was “to extend the jurisdiction of the existing Radio Commission to embrace telegraph and telephone *508 communications as well as those by radio.” (Weiss v. United States, 308 U. S. 321, 328; see, also, Benanti v. United States, 355 U. S. 96, 104, n. 14, supra.) The Supreme Court has recently emphasized (Benanti v. United States, supra, p. 104) that the Act “is a comprehensive scheme for the regulation of interstate communications ”.
Section 605 of the Act is entitled [1] ‘ Unauthorized publication or use of communications ” (emphasis supplied), and that portion of section 605 which is claimed to have pre-empted subdivision 6 of section 1423 of our Penal Law reads as follows : “ nó person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person” (emphasis supplied). Section 501 of the Act makes a violation of section 605 punishable by a $10,000 fine or imprisonment for one year or both, and is applicable to “ Any person who willfully and knowingly does or causes or suffers to be done any act * * * in this chapter prohibited or declared to be unlawful ” (emphasis supplied).
In Weiss v. United States (supra, pp. 327, 329) the Supreme Court held that the above-quoted clause of section 605 was applicable to the “ interception and divulgence ” of intrastate as well as interstate communications. Such a holding was necessary, explained the court in the Benanti case {supra, pp. 104-105), “ In order to safeguard those interests protected under Section 605 ’ ’, and in view of the practical consideration that ‘[1] the interceptor cannot discern between the two and will listen to both ’ ’.
The New York statutory scheme relative to wire tapping is far more comprehensive than section 605 in that section 552-a (now § 742) of the Penal Law renders criminal the possession of wire-tapping instruments with intent to use them unlawfully, and subdivision 6 of section 1423 punishes the use of rooms and apparatus for illegal wire tapping, as well as wire tapping itself. We are here concerned only with whether section 605 pre-empts that part of subdivision 6 of section 1423 which makes it criminal to ‘ ‘ tap, or make connection with any telegraph or telephone line, wire, cable or instrument ”. Twelve of the counts of which defendant was convicted charged substantive *509 crimes of unlawful wire tapping, reciting specific interceptions between certain dates with respect to specific telephone numbers and subscribers, and it was on four of these counts that defendant was sentenced to a prison term.
In resolving the pre-emption issue, it is first necessary to decide the preliminary question of whether subdivision 6 of section 1423, insofar as it prohibits wire tapping, impinges on Federal jurisdiction. This question is important because it has been long established that “ the same act might, as to its character and tendencies, and the consequences it involved, constitute an offence against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each.” (United States v. Marigold, 9 How. 560, 569; see, also, Abbate v. United States, 359 U. S. 187, and Barthus v. Illinois, 359 U. S. 121, decided March 30, 1959, and pertinent cases therein cited; Cross v. North Carolina, 132 U. S. 131, 139; Sexton v. California, 189 U. S. 319, 322-323; Southern Ry. Co. v. Railroad Comm. of Indiana, 236 U. S. 439, 445; People v. Welch, 141 N. Y. 266, 276; People v. Fury, 279 N. Y. 433, 437.)
In Pennsylvania v. Nelson (350 U. S. 497, supra), where a State sedition statute was held pre-empted by the Smith Act, the Supreme Court pointed out, at the outset of their opinion (p. 500), that the decision in that case did not “ prevent the State from prosecuting where the same act constitutes both a federal offense and a state offense under the police power, as was done in Fox v. Ohio, 5 How. 410, and Gilbert v. Minnesota, 254 U. S. 325 ”. In discussing the two cited cases, the Supreme Court noted (pp. 500-501): “In neither of those cases did the state statute impinge on federal jurisdiction.” (Emphasis supplied.)
The question has a dual aspect in the instant case, namely, whether our penal provision against wire tapping impinges either on Federal constitutional jurisdiction under the commerce clause, or on Federal criminal jurisdiction under section 605. As to the former, we do not look upon subdivision 6 of section 1423 as an attempted regulation of telephonic communications, but simply as “ a local police measure ” designed to protect the people of this State against unwarranted intrusions into *510 their privacy. As the Supreme Court noted in the Nelson case (supra, p. 517), in quoting from Gilbert v. Minnesota (254 U. S. 325, 330-331), “ ‘ To do so is not to usurp a National power, it is only to render a service to its people ’ As to the possibility of encroachment on Federal criminal jurisdiction, the problem arises here because the nature of the offense made punishable by section 605 of the Federal Act is not clear. While subdivision 6 of section 1423 of our Penal Law clearly makes criminal the act of wire tapping, section 605 seems to require both an interception and a divulgence or publication of ‘ ‘ the existence, contents, substance, purport, effect, or meaning of such intercepted communication ’ \ In other words, section 605, on its face, does not appear to prohibit wire tapping as such, but seems to make it criminal only when the tapper divulges or publishes the existence of the tap or the information obtained (see article by former Atty. Gen. Brownell, 39 Cornell L. Q. 195, 197-198).
In the Benanti case (supra), which held that wire-tap evidence was not admissible in a Federal court in a prosecution for a Federal crime, even when obtained by State law-enforcement officers under a court order, the Supreme Court expressly left the issue open when it stated (p. 100, n. 5): “ Because both an interception and a divulgence are present in this ease we need not decide whether both elements are necessary for a violation of § 605. Also because here the disclosure was of the existence of the communication, it is not necessary for us to reach the issue whether § 605 is violated by an interception of the communication and a divulgence of its fruits without divulging the existence, contents, etc. of the communication.” (See, also, Rathbun v. United States, 355 U. S. 107, 108, n. 3.) It is clear, as noted, that subdivision 6 of section 1423 is violated by an interception alone, whether or not there is a divulgence of the communication and/or its fruits. If section 605, on the other hand, does not make criminal the act of wire tapping, then there would appear to be no impingement on Federal criminal jurisdiction.
A persuasive argument for reading section 605 as requiring both an interception and a divulgence, in addition to the plain wording of the statute and its title, and the long-established canon of construction that a penal statute must be strictly *511 construed (Yates v. United States, 354 U. S. 298, 30A-305), is that a contrary holding would result in making the act of divulging itself criminal, even when done by someone unrelated in any way to the interception of the communication. This would necessarily follow from a construction of the statute that made the act of interception alone criminal, since section 605 forbids the interception and divulgence of a communication, and if interception alone is a crime so must divulgence alone also be a crime. And the divulgence necessary to constitute the crime would not necessarily have to be of the content of the intercepted communication, since, as pointed out in the Benanti case (supra,' p. 100), section 605 “forbids the divulgence of 1 the existence * * * ’ of the intercepted message ” (emphasis in original). It is difficult to believe that in enacting section 605 Congress meant to punish one who, having no part in the actual wire tapping itself, merely made it known that there had, in fact, been a tap.
Assuming arguendo, however, that subdivision 6 of section 1423 of our Penal Law does impinge on Federal jurisdiction, we must then decide whether the Federal statutory provision was intended to supersede our statute. In the absence of section 605 it seems clear that New York, as a legitimate exercise of its police power, could make wire tapping a crime so as to protect its citizens from the invasion of privacy implicit in wire tapping. Congress did enact section 605, but in so doing it did not indicate whether it meant to preclude the States from themselves punishing wire tapping. Faced with a similar situation in the Nelson case (supra, p. 501) —wherein it was noted: ‘ ‘ Congress has not stated specifically whether a federal statute has occupied a field in which the States are otherwise free to legislate ” — the Supreme Court invoked three criteria to aid in determining’ whether the State statute was superseded.
The first of these criteria (350 U. S. 502) was whether “ ‘ [t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it’ ”. In the recent Benanti case (supra), in answer to the argument that the interception and divulgence involved in that case did not violate section 605, since the State officers in placing the taps had acted pursuant to a court order authorizing them to wire tap (N. Y. Const., *512 art I, § 12; Code Grim. Pro., § 813-a), the court, in indicating that section 605 evidenced a public policy against the interception and divulgence of communications, stated (355 U. S. 105-106) “ that Congress, setting out a prohibition in plain terms, did not mean to allow state legislation which would contradict that section and that policy ” (emphasis supplied). (See, in this connection, Schwartz v. Texas, 344 U. S. 199; People v. Variano, 5 N Y 2d 391.) We do not think that, in so stating, the court meant to imply that section 605 was so pervasive as to preclude a State penal statute punishing wire tapping. It is, of course, true that once Congress has occupied a field a State statute is superseded whether it contradicts or merely supplements the Federal statute (see Pennsylvania v. Nelson, supra, p. 504). But whether Congress has occupied the field to the exclusion of State laws is a matter of intention (see California v. Zook, 336 U. S. 725, 729-730) and, reading the language in Benanti in context, we do not think it was intended to indicate that Congress had occupied the field of wire tapping. Certainly, when the single clause of section 605 is compared with the broad sweep of the Smith Act (54 U. S. Stat. 670; U. S. Code, tit. 18, §§ 2385, 2387) and the Communist Control Act (68 U. S. Stat. 775; U. S. Code, tit. 50, § 841 et seq.), the Nelson case is hardly persuasive authority for holding the States pre-empted from punishing wire tapping. The Supreme Court, in the Nelson case, emphasized the comprehensive nature of Federal anti-subversive legislation in concluding (350 U. S. 504) that, ‘ ‘ Taken as a whole, they evince a congressional plan which makes it reasonable to determine that no room has been left for the States to supplement it.”
Unlike the New York statutory provisions, section 605 does not attempt to deal with the preparatory and attendant activities essential to wire tapping, such as the acquisition of premises and equipment, the assembling of apparatus and the like. It is a general interdiction against the interception and divulgence of any type of ‘ * communication ’ ’ and it does not, in our opinion, “ evince a congressional plan ” to occupy the field of wire tapping. On the contrary, we think it reasonable to assume that Congress intended to leave room for a State to punish the tapping of telephones within its borders.
*513 The second criterion set forth in the Nelson case (supra, p. 504) was whether ‘ ‘ the federal statutes ‘ touch a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject.’ ” In pointing to the “ all-embracing program for resistance to the various forms of totalitarian aggression ” (p. 504, emphasis supplied) devised by Congress, the court (p. 505) underlined the fact that “ ‘ Sedition against the United States is not a local offense. It is a crime against the Nation.’ ” (Emphasis in original.) While it is true that, broadly speaking, interstate telephonic communications fall under the Federal aegis, and that section 605, in order to be effective, applies equally to intrastate communications, this hardly imports that a State is powerless to protect the privacy of its own citizens by forbidding the tapping of telephones within the State. It would seem that protecting the individual’s right of privacy is an area primarily entrusted to the care of the States rather than the Federal Government, falling logically within the ambit of the State’s police power. In any case, the field of wire tapping would not appear to be so peculiarly affected with a Federal interest that State regulation ‘ ‘ must be assumed ’ ’ to be precluded.
The third and final criterion of supersession discussed in the Nelson case (supra, p. 505) was whether enforcement of the State statute “ presents a serious danger of conflict with the administration of the federal program ”. We perceive no such “ danger of conflict ” here. Entirely lacking in the instant case is evidence of any requests to local authorities, by the President or the Director of the Federal Bureau of Investigation, in the nature of those present in the Nelson case, to turn over to Federal authorities all information concerning wire-tapping activities so as to “ avoid a hampering of uniform enforcement of its program by sporadic local prosecutions ” (supra, pp. 505-509). The sparsity of prosecutions under section 605 (see annotations in 47 U. S. C. A.) indicates the absence of any 11 federal program ’ ’ to combat wire tapping, and the recent Congressional efforts at legislation in this field have been in the direction of legalizing wire tapping by Federal officers in certain circumstances (39 Cornell L. Q., supra, p. 209, n. 53). Permitting the States to punish wire tapping would appear to *514 present none of the difficulties outlined by the Supreme Court in the Nelson case.
We cannot help but conclude that subdivision 6 of section 1423 of our Penal Law punishes the conscious and deliberate tapping of telephones within the State and in so doing does not offend the supremacy clause of the Federal Constitution.
Defendant next attacks the court’s charge to the jury on the grounds that it was too long, that it failed to indicate what evidence could be properly considered as corroborative of the testimony of the accomplices, and that it generally failed to relate the evidence to the questions posed; as to the last ground, no exception was noted. We find no merit in these arguments. A reading of the charge as a whole demonstrates that it was clear as well as thorough, and provided the jury with a comprehensive summary of the evidence, the issues involved and the applicable legal principles. The court clearly and repeatedly charged that the corroborative proof necessary to convict had to be independent evidence tending to connect defendant with the commission of the crimes, and that evidence tending to show only that a crime was committed, as well as evidence of mere association of the accomplices with defendant, was insufficient.
Finally, defendant contends that he was deprived of a fair trial by several allegedly prejudicial remarks made by the prosecutor in his summation. In the first two challenged statements, the District Attorney, in reply to implications of the defense counsel that he had deliberately failed to call two material witnesses and had withheld evidence implicating one Gfris as the real mastermind of the wire-tap operations, improperly supported his case by the weight of his personal integrity and position (see People v. Lovello, 1 N Y 2d 436). No objection was registered to either of these statements, however, nor were they made the grounds of a motion for a mistrial; hence they are not open to us for review (People v. Pindar, 210 N. Y. 191, 196; People v. Levine, 297 N. Y. 144, 148; People v. Tassiello, 300 N. Y. 425; People v. Lovello, supra). As to the prosecutor’s assertion of the “ axiom ” that in a hopeless case the tactic is to try the District Attorney, there is also no ruling before us to review. The defense attorney’s objection was sustained, the jury was instructed to disregard the statement, *515 and the defense attorney not only failed to move for a mistrial but apparently acquiesced in the court’s handling of the matter when he finally said ‘ ‘ All right ’ ’.
There are only two statements which were the subject of a motion for a mistrial and only two court rulings which we are enabled to review as rulings of law. One was the remark 1 ‘ How does he [defense attorney] know what I know, or I don’t know? ”, to which no objection was taken at the time but which was made the subject of a motion for a mistrial at the close of the prosecutor’s summation. The'court denied the motion, but instructed the jury to disregard the remark. Defendant claims that under our decision in People v. Tassiello (supra, p. 430), which cited Berger v. United States (295 U. S. 78, 88), his motion for a mistrial with respect to this remark 1 ‘ should have been granted, as a matter of right ” since “ the prosecutor was baldly hinting at his personal knowledge of matters outside the record which could well influence the jury’s verdict”.
Although the prosecutor’s remark was uncalled for, it certainly lacks the prejudicial content of a claim of personal knowledge “ that defendant’s counsel * * * had become convinced of his client’s guilt ”, as was the situation in Tassiello (supra, p. 430), or of a suggestion “that statements had been made to him [the District Attorney] personally out of court ’ ’, which was only one of many reprehensible tactics employed by the prosecutor in the Berger case (supra, p. 84). The trial court here instructed the jury to disregard the remark, and again cautioned the jury in its charge that “ any suggestions * * * conveyed to your minds -of things not in evidence * * * should be resolutely removed from any consideration by you ’ ’. Under these circumstances, we are unable to say that the trial court abused its discretion in denying the motion for a mistrial.
The final claim of error relates to the prosecutor’s remark: ‘11 am the fellow you should convict if I deliberately permitted that man [Huh] to commit perjury, knowing it in my heart and soul? ”, as to which a motion for a mistrial was promptly made. This statement was similar to those made in the Lovello case {supra). In sharp contrast to Lovello, however (and People v. Swanson, 278 App. Div. 846), where the court overruled the objection taken and thereby “ indicated to the jury that there *516 was no impropriety” (1 N Y 2d 439) and “ sustained, by Ms ruling, the district attorney in this line of argument ” (People v. Minkowitz, 220 N. Y. 399, 405), the trial court here sustained the objection to the remark and twice instructed the jury to completely disregard, in their decision of the case, statements of personal belief by the attorneys. In its charge, the court again emphasized to the jury that they were not to be influenced by unsupported statements of counsel, and said further: “I repeat what I previously told you—what the lawyers said is not evidence. The evidence-came from the witnesses and you alone are the sole judges as to what the witnesses testified and what the facts are.”
In determining whether improper remarks in summation require a new trial, it would seem of vital significance whether the trial court, as stated by Presiding Justice Peck in his dissent in the Lovello case, “ gave standing to the statement of the District Attorney as legitimate argument ” (1 A D 2d 167, 169) or whether, as here, the trial court promptly advised the jury that the statement was improper and must be wholly disregarded. We thus conclude that the prompt and complete instructions of the trial court in the instant case, repeated in his charge, prevented the improper remark from having any serious consequence, and that the court did not abuse its discretion in denying the motion for a mistrial.
The judgment appealed from should be affirmed.

. This and the other remarks were quite similar to those condemned in People v. Lovello (1 N Y 2d 436, supra), but it should be noted that the trial against the present defendant was held some months before this court decided the Lovello ease.